**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**(Tampa Division)**

|  |  |
|---|---|
| JOSHUA LENZ, TRACI LENZ, JASON NORQUIST, AMIE NORQUIST, RYAN MORGAN, ERICA MORGAN, GARY ELBON, KAYLA ELBON, JASON GENRICH, JENNY GENRICH, individually and on behalf of all others similarly situated, | 8:19-cv-2950-T-30AEP<br>Civil Action No.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>(1) Breach of Contract.<br>(2) Breach of Implied Warranty of Habitability, Fla. Stat. § 83.51.<br>(3) Violations of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, *et seq.*<br>(4) Negligence / Gross Negligence.<br>(5) Unjust Enrichment. |
| Plaintiffs, | |
| v. | |
| THE MICHAELS ORGANIZATION, LLC, MICHAELS MANAGEMENT SERVICES, INC., INTERSTATE REALTY MANAGEMENT COMPANY, AMC EAST COMMUNITIES, LLC, CLARK REALTY CAPITAL LLC, and HARBOR BAY AT MACDILL, | **INJUNCTIVE RELIEF SOUGHT**<br><br>**DEMAND FOR JURY TRIAL** |
| Defendants. | |

## INTRODUCTION

1.      This action is brought by Plaintiffs Joshua Lenz, Traci Lenz, Jason Norquist, Amie

Norquist, Ryan Morgan, Erica Morgan, Gary Elbon, Kayla Elbon, Jason Genrich, and Jenny

Genrich (collectively, "Plaintiffs"), who are members of the United States Military and their

spouses currently or formerly housed at MacDill Air Force Base in Tampa, Florida, against

Defendants The Michaels Organization, LLC ("Michaels"), Michaels Management Services, Inc.

("MMS"), Interstate Realty Management Company, AMC East Communities, LLC ("AMC"),

Clark Capital Realty LLC ("Clark"), and Harbor Bay at MacDill ("Harbor Bay") (collectively,

"Defendants"), for breach of contract, breach of the implied warranty of habitability, Fla. Stat. §

83.51, violations of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat.

§ 501.201, *et seq.*, negligence / gross negligence, and unjust enrichment, in connection with

Defendants' blatant violations in complying with the most basic standards for providing safe and mold-free housing to these United States Military service members and their spouses and children.

2.      The men and women of our country's armed forces deserve better housing and treatment than what they have received from Defendants, and this Complaint seeks to remedy the gross injustices and severe damages that Plaintiffs and those similarly situated have suffered.

3.      Pursuant to a contract with the United States Air Force under the Military Housing Privatization Initiative ("MHPI"), Defendants own and/or operate housing facilities for Air Force and Army service members and their families stationed at MacDill Air Force Base ("MacDill AFB") in Tampa, Florida. MacDill AFB houses the 6th Air Mobility Wing and is part of the Air Mobility Command ("AMC") for the United States Air Force.

4.      The MHPI is part of the 1996 National Defense Authorization Act's authorization of the privatization of military housing. According to a March 2019 report from the Government Accountability Office, the United States Military currently contracts out ninety-nine percent (99%) of housing on its bases to private companies such as Defendants. This means that companies such as Defendants stand to profit from such housing provided to members of our country's armed forces.

5.      The goal of the MHPI is to provide military families with access to safe, quality, affordable, well-maintained housing in a community where they choose to live. MHPI projects involve the Air Force leasing land and conveying housing and associated improvements to a private developer for the purpose of revitalizing, maintaining, and managing Air Force family housing communities for a period of 50 years. With respect to MacDill AFB, the private developers are Defendants AMC and Clark.

6.    Unfortunately, AMC, Clark, and the other Defendants have failed miserably in meeting the goal of the MHPI to provide "safe, quality, affordable well-maintained housing" to the residents of MacDill AFB. As set forth in detail below, Defendants' development, operation, maintenance, and management of the military housing at MacDill AFB has led to serious and ongoing problems with not only the safety and soundness of the housing itself, but also the health and welfare of the military families living there.

7.    Defendants' failure to properly develop, build, maintain, and manage Plaintiffs' and the proposed Class members' housing at MacDill AFB has resulted in widespread and well-known problems with mold, leading to serious injuries and safety issues for Plaintiffs, Class members, and their families. As a result of mold exposure, Plaintiffs and Class members have paid excessive amounts for the housing they rented, have incurred unreimbursed out-of-pocket economic losses, and have suffered and continue to suffer from severe health issues including, without limitation, pulmonary and respiratory problems, sinusitis, enlarged lymph nodes, allergies, headaches, and rashes, among other medical issues.

8.    Service members and their families living in privatized military housing often have little or no recourse if they are dissatisfied with the property owner and management company. This is because rents, in the form of the service members' basic allowance for housing ("BAH"), are automatically withdrawn from service members' accounts and paid to Defendants. Plaintiffs and Class members do not have the ability to withhold rent when Defendants fail to properly maintain their homes. Even when Plaintiffs and their children were displaced from their homes for lengthy periods of time and forced to live in motels, hotels, or other temporary housing while Defendants purported to attempt to remediate the problems with moisture and mold, Defendants continued to withdraw Plaintiffs' BAH.

9.    In May 2019, the Military Family Advisory Network ("MFAN"), a 501(c)(3) charitable organization connecting military families, issued a 200-page Research Report on Living Conditions of Families in Privatized Military Housing (the "MFAN Report").[1] As part of the MFAN Report, MFAN conducted surveys of service members at various military installations, including but not limited to MacDill AFB. Based on the responses of 105 service members at MacDill AFB, *more than 54%* reported that they had experienced problems with mold. *See* MFAN Report at 102.

10.    Mold problems at MacDill AFB have been so extensive that the United States Air Force penalized Defendants in 2019 by cutting the money that Defendants receive through a performance incentive fee. Colonel Stephen Snelson, the Commander of the 6th Air Refueling Wing at MacDill AFB, specifically noted that the Air Force's action in cutting these fees was "due to mold remediation complaints" raised by United States service members.

11.    When notified by Plaintiffs and other Class members of mold problems in their homes, Defendants have not adequately addressed the problems. To the contrary, Defendants: (a) have denied the existence and severity of systemic mold problems at MacDill AFB; (b) have delayed in responding appropriately; (c) have conducted moisture and mold tests while refusing to share the results with Plaintiffs, Class members, and the public; and (d) have engaged in inadequate and shoddy efforts to remediate the mold problems at MacDill AFB, including in many instances by only addressing visible areas that can easily be seen, such as, for example, simply painting over moldy or wet areas in the homes of Plaintiffs and Class members.

---

[1]    A copy of the MFAN Report is available at https://militaryfamilyadvisorynetwork.org/wp-content/uploads/FINAL-report-5.20-_FOR-RELEASE.pdf.

12.     Worse yet, in some instances, obvious mold areas were sanded without the proper mold remediation measures in place, dispersing air-borne mold spores throughout the residence and contaminating the entire residence and personal property belonging to members of the United States Military, their spouses, and their children.

13.     In at least one instance, moldy conditions went untreated by Defendants for so long that mushrooms grew out of the floor and carpet in one Class member's home at MacDill AFB.



14.     Indeed, once a leak, flood, or dampness occurs, mold can begin to spread, and its natural progression is to spur highly toxic "mold mushrooms" that are harmful to humans and animals alike.

15.     In other instances, Plaintiffs, Class members, and their families, have been forced to vacate their homes at MacDill AFB and move into temporary housing for extended periods of time – often weeks at a time. As set forth below, one of the named Plaintiffs and his family spent *58 days* in temporary housing within a seven-month period between February and September 2019.

16.     During these times, Plaintiffs and Class members have been forced to stay in temporary living facilities, motels, or hotels, having access to only a fraction of the living space of the home that they were obligated to continue to pay for through the automatically deducted BAH payment to Defendants.

17.     As a direct result of prolonged mold exposure, Plaintiffs, Class members, and their children have suffered and continue to suffer serious health symptoms, including headaches, fatigue, rashes, and respiratory problems.

18.     Despite their knowledge and awareness of the pervasiveness of the mold problems in the housing at MacDill AFB, and despite their knowledge that Plaintiffs and Class members have suffered and continue to suffer adverse economic and medical effects resulting from prolonged exposure to mold, Defendants have often refused to share the results of mold and moisture inspections taken after a purported remediation, forcing Plaintiffs and Class members to pay out of pocket to conduct their own follow-up inspections. Certain of those tests have shown continued high readings of moisture and mold even after a remediation has taken place.

19.     The severe toll on United States service members from living in substandard, mold-infested housing, cannot be overstated. These men and women who serve our country and keep us safe, and their children, deserve to live in safe, clean, and uncontaminated housing. It is difficult for United States service members to focus on their critical role of keeping our country safe when they are themselves suffering from health problems and worried about the health and safety of their spouses and children.

20.     Ron Hansen, the President of Defendants Michaels and MMS, has stated publicly that "The Air Force is not responsible for any of this. When people are pointing fingers at someone for maintenance issues, they're pointing at us and they're right."[2]

21.     Yet, despite widespread news coverage and recognition of the severe and pervasive problems at MacDill AFB in housing owned and managed by Defendants, including through U.S. Department of Defense reports and hearings before the Senate Armed Forces Committee, Defendants continue to refuse to address the problems on anything other than a piecemeal, incomplete, and ineffective basis. In the meantime, Plaintiffs and Class members continue to suffer, and therefore bring this Class Action Complaint to remedy their damages and protect all of those residing at MacDill AFB.

## PARTIES

### A.    Plaintiffs

22.     Plaintiff Joshua Lenz, a Master Sergeant in the United States Air Force, and his wife, Traci Lenz, are citizens of North Carolina. The Lenzes previously resided on MacDill AFB at 1805 Billy Mitchell Loop in Tampa, Florida.

23.     Plaintiff Jason Norquist, a Special Forces Officer in the United States Army, and his wife, Amie Norquist, are citizens of North Carolina. The Norquists previously resided on MacDill AFB at 8326 Marauder Drive in Tampa, Florida.

24.     Plaintiff Ryan Morgan, a Staff Sergeant in the United States Air Force working as a Network Operations Technician at MacDill AFB, and his wife, Erica Morgan, are citizens of

---

[2]  *See Mold in Homes Still Affecting Military Families*, WFLA 8 News Nov. 14, 2019, https://www.wtsp.com/article/news/investigations/10-investigates/10investigates-mold-military-families/67-686b94de-cda1-42c9-b036-cd552e96ed4d.

7

Florida residing on MacDill AFB. The Morgans previously resided on MacDill AFB at 8522 Levitow Street in Tampa, Florida.

25.    Plaintiff Gary Elbon, a Staff Sergeant in the United States Air Force working as a Criminal Records and Data Manager for the Security Forces Squadron, and his wife, Kayla Elbon, are citizens of Florida residing on MacDill AFB in Tampa, Florida.

26.    Plaintiff Jason Genrich, a Chief Warrant Officer Three in the United States Army, and his wife, Jenny Genrich, are citizens of Florida. The Genrichs previously resided at 8412 Tampa Point Blvd., on MacDill AFB in Tampa, Florida.

**B.    Defendants**

27.    Defendant The Michaels Organization ("Michaels") is a New Jersey limited liability company with its principal place of business located at 2 Cooper Street in Marlton, New Jersey. Michaels was founded by Michael Levitt, who serves as its Chairman, and is operated by John J. O'Donnell, who serves as its Chief Executive Officer, and Mark Morgan, who serves as its Chief Operating Officer. According to Michaels' website, Ron Hansen serves as Michaels' President and leads its "military housing development, renovations, and management operations." Mr. Hansen also serves as President of MMS. Kimberlee Schreiber serves as President of both Michaels and Interstate Realty Management Co. Michaels is registered with the State of Florida Division of Corporations to do business in Florida. Michaels is the ultimate parent of Defendants Michaels Management Services, Inc. and Interstate Realty Corp.

28.    Defendant Michaels Management Services, Inc. ("MMS") is a New Jersey corporation with its principal place of business located at 3 East Stow Road, Marlton, New Jersey. MMS is registered with the State of Florida Division of Corporations to do business in Florida. MMS is a subsidiary of Michaels. Ron Hansen, President of Michaels, also serves at the President

of MMS. MMS serves as the Property Manager and an agent for AMC and is so designated on leases signed by Plaintiffs Joshua Lenz, Jason Norquist, Ryan Morgan, and Jason Genrich.

29.    Defendant Interstate Realty Management Co., Inc. ("Interstate") is a New Jersey corporation with a principal place of business located at 3 East Stow Road, Suite 100, Marlton, New Jersey. Interstate had registered with the State of Florida Division of Corporations to do business in Florida beginning in 2017. On August 22, 2019, Interstate filed a notice to withdraw its registration. Interstate is a subsidiary of Michaels and is listed as the Property Manager and an agent for AMC on the lease signed by Plaintiff Gary Elbon. Kimberlee Schreiber serves as President of both Michaels and Interstate.

30.    Defendant AMC East Communities, LLC ("AMC") is a Delaware limited liability company with its principal place of business located at 4401 Wilson Boulevard, Suite 600, Arlington, Virginia. AMC is listed as the "Owner" on the leases signed by Plaintiffs Joshua Lenz, Jason Norquist, Ryan Morgan, Gary Elbon, and Jason Genrich.

31.    Defendant Clark Realty Capital, LLC ("Clark") is a Delaware limited liability company with its principal place of business located at 4401 Wilson Boulevard, Suite 600, Arlington, Virginia. Clark created and operates AMC as part of its operations in Florida. Clark maintains its Florida office at 2120 Secord Avenue, Tampa, Florida. On its website, Clark states that "[a]s a part of the Air Mobility Command East (AMC East), MacDill Air Force Base was the company's first endeavor under the Air Force's housing privatization program," boasting that its family housing at MacDill has garnered numerous recognitions, including the 2014 MarCom Award, the 2013 Nationals Award, the 2012 Pillars of the Industry Award, the 2011 Multifamily Executive Award, and the 2010 Builder's Choice Design and Planning Award. Clark hired Defendant MMS to serve as the property manager for the MacDill AFB family housing.

9

32.     Defendants AMC and MMS jointly manage privatized housing located on MacDill AFB under the name Harbor Bay at MacDill ("Harbor Bay"). Harbor Bay has a principal place of business located at 8414 Fortress Drive in Tampa, Florida.

33.     As listed on Harbor Bay's Facebook webpage, as well as on the United States Air Force webpage, the email address for Harbor Bay is harborbay@themichaelsorg.com. Harbor Bay is listed as the "Landlord/Lessor" on the Mold Addendum attached to Plaintiff Jason Genrich's lease.

## JURISICTION AND VENUE

34.     This Court has jurisdiction over this action under 28 U.S.C. § 1331 because MacDill AFB is a federal enclave.

35.     Diversity jurisdiction also exists under 28 U.S.C. § 1332.

36.     The Court also has jurisdiction under the Class Action Fairness Act and 28 U.S.C. § 1332(d)(2) because certain of Plaintiffs and members of the Class are citizens of the State of Florida and at least one Defendant is a citizen of a different state, and because the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

37.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because MacDill AFB is located in this District; Plaintiffs and Class members' rented properties are located in this District; and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTUAL ALLEGATIONS

### A.    Mold and Its Adverse Health Effects

38.    Mold is a type of fungus that consists of small organisms. They can be black, white, orange, green, or purple. Molds thrive on moisture and reproduce by means of tiny, lightweight spores that travel through the air.

39.    In housing, mold grows in locations where there is moisture, such as around leaks in roofs, windows, HVAC systems, or pipes, or where there has been flooding or moisture buildup. Mold grows well on paper products, cardboard, ceiling tiles, and wood products. Mold can also grow in dust, paints, wallpaper, insulation, drywall, carpet, fabric, and upholstery. Mold can be particularly problematic if moisture is trapped between laminate flooring or tile and the underlying wooden floors beneath those surfaces.

40.    If mold is growing in a home, the mold needs to be addressed and remediated immediately *and* the underlying moisture problem needs to be remediated as well. The Centers for Disease Control and Prevention ("CDC") recommends that "[n]o matter what type of mold is present, you should remove it ... and work to prevent future growth." *See* https://www.cdc.gov/mold/dampness_facts.htm.

41.    It is well-known and generally accepted that human exposure to damp and moldy environments can cause a variety of serious adverse health effects, including headaches, nasal stuffiness, throat irritation, coughing or wheezing, eye irritation, skin irritation, pulmonary distress, and injury to cognitive symptoms. People with mold allergies may have more severe reactions. Immune-compromised people and people with chronic lung illnesses, such as obstructive lung disease, may suffer serious infections in their lungs when they are exposed to mold. In addition,

11

certain molds produce mycotoxins, toxic chemicals that can lead to neurological problems and even death, particularly when an individual has prolonged exposure to the mold spores.

42.    In 2004, the Institute of Medicine ("IOM") – which is affiliated with the National Academies of Science and serves as a nonprofit organization devoted to providing leadership on health care – found that there was sufficient evidence to link indoor exposure to mold with upper respiratory tract symptoms, cough, and wheeze in otherwise healthy people; with asthma symptoms in people with asthma; and with hypersensitivity pneumonitis in individuals susceptible to that immune-mediated condition. https://www.cdc.gov/mold/dampness_facts.htm. The IOM also found evidence linking indoor mold exposure and respiratory illness in otherwise healthy children. *Id.*

43.    Other recent studies have suggested a link between early mold exposure and the development of asthma in children, particularly children who may be genetically susceptible to asthma development. Studies show that selected interventions that improve housing conditions can reduce morbidity from asthma and respiratory allergies. *Id.*

**B.    Defendants' Awareness of Mold in MacDill AFB Homes**

44.    Defendants have long been aware of the serious mold problems at MacDill AFB. Numerous complaints of mold and mold-related health issues have been made by Class members dating back to at least 2016. Discovery in this case will uncover the extent of these complaints.

45.    The Resident Guidelines and Community Handbook for MacDill Air Force Base ("MacDill Handbook"), published by AMC in December 2016, has an entire section dedicated to a discussion of mold. The MacDill Handbook also includes a "Resident Tip Sheet on Mold" advising residents to "IMMEDIATELY report" the following: (i) any evidence of a water leak or excessive moisture; (ii) any evidence of mold growth that cannot be removed by simply applying

12

a common household cleaner and wiping the area; (iii) any failure or malfunction with HVAC or laundry systems; or (iv) any musty odors.

46.    Despite Defendants' recognition of the causes of mold and the speed with which it can become a problem, it often takes weeks when Plaintiffs and Class members report problems for Defendants to schedule maintenance appointments and remediation efforts to address leaks, HVAC problems, and other issues with moisture and/or mold. During this time, the underlying moisture remains untreated, leading to additional mold growth, including behind walls and under subflooring where the mold is present and affects the inhabitants but cannot be seen.

47.    The mold problems at MacDill AFB have been evident in many homes that are built on stilts. These homes frequently contain a building defect including, without limitation, the lack a proper vapor barrier between the first floor of the home and the outdoors. The air conditioning units for these homes also lack a second line. These problems, combined with others, make the homes at MacDill AFB ripe for mold infestation. Further compounding these structural issues is Defendants' failure to maintain an appropriate preventative maintenance program for the military housing, and Defendants' lackadaisical approach to fixing problems with moisture and mold immediately when they arise. These are issues that are susceptible to a class-wide resolution and Plaintiffs file this Class Action Complaint to address these issues.

48.    In the last year alone, dozens of articles and news reports have highlighted the extensive and serious problems with mold at MacDill AFB. A few examples are listed below:

- *MacDill Penalizes Base Housing Operator Over Mold as Bilirakis Launches Congressional Inquiry*, Tampa Bay Times, Feb. 3, 2019, https://www.tampabay.com/news/military/macdill-penalizes-base-housing-operator-over-mold-as-bilirakis-launches-congressional-inquiry-20190201/;

- *Combat Veteran on Mold Problem: "MacDill was the Worst Place I Ever Lived"*, Tampa Bay Times, Feb. 13, 2019,

> https://www.tampabay.com/news/military/combat-veteran-on-mold-problem-macdill-was-the-worst-place-i-ever-lived-20190213/;
>
> - *Survey of Families Finds Slum-Like Base Housing*, The Fayetteville Observer, Feb. 14, 2019, https://www.fayobserver.com/news/20190214/survey-of-families-finds-slum-like-base-housing;
>
> - *New Report Highlights More Mold and Maintenance Problems for MacDill Housing*, WFLA 8, May 22, 2019, https://www.wfla.com/8-on-your-side/new-report-highlights-more-mold-and-maintenance-problems-for-macdill-housing/;
>
> - *More Than Half of Families Surveyed at MacDill AFB Complain of Mold*, Fox 13 Tampa Bay, May 23, 2019, https://www.fox13news.com/news/more-than-half-of-families-surveyed-at-macdill-afb-complain-of-mold; and
>
> - *"Despicable": Mold Problems Still an Issue for Families at MacDill AFB*, WFLA 8 November 11, 2019, https://www.wfla.com/news/hillsborough-county/despicable-mold-problems-still-an-issue-for-families-at-macdill-afb/.

49. The problems and complaints have been so severe and pervasive that in March 2019, the Secretary of the United States Air Force, Heather Wilson, visited MacDill AFB to hear residents' concerns about mold and other problems with their housing owned and managed by Defendants.

50. In June 2019, the United States Air Force brought a representative from the United States Environmental Protection Agency ("EPA") to speak to families residing at MacDill AFB in order to discuss mold problems on the base.

51. Despite these complaints and actions and the deteriorating health of Plaintiffs and Class members living in mold-infested homes, Defendants have done little to accept responsibility, compensate Plaintiffs and Class members for their damages, and address the problems. For example, instead of holding themselves accountable and fully inspecting each of the homes on MacDill AFB to proactively and preemptively identify issues related to moisture, water leaks, and

14

mold, Defendants have continued to wait until United States Military service members such as Plaintiffs and Class members contact Defendants to complain of a problem that is already beyond preventative maintenance. In so doing, Defendants are continuing to collect rent while ignoring their responsibilities to provide safe, clean, and uncontaminated housing to the United States Military members who reside at MacDill AFB.

52.    The Merriam Webster definition of the term "slumlord" is "a landlord who receives unusually large profits from substandard, poorly maintained properties." *See* https://www.merriam-webster.com/dictionary/slumlord. Defendants' conduct as detailed in this Complaint meets the Merriam-Webster definition of the term.

53.    For example, Defendants will often offer cosmetic solutions (including simply washing or painting over mold) without fully inspecting the homes at MacDill AFB in order to identify and remedy the underlying cause of the moisture and mold problems, let alone properly remediate the underlying problems.

54.    In addition, Defendants do not disclose to service members moving into military housing on MacDill AFB that there are known problems with mold, even when Defendants have previously remediated mold in the house that the service member is moving into.

55.    Defendants also have failed to disclose to Plaintiffs and Class members the results of mold and moisture tests, leaving Plaintiffs and Class members in the dark about the nature of the overall problems at MacDill AFB and how serious the problems are. As a result, Plaintiffs and Class members have been forced to pay out of pocket for their own mold specialists to perform inspections and testing, and to convince Defendants to do something about the problems.

56.    Even where Defendants do undertake any steps to attempt to remediate a mold problem, the repairs can take weeks and displace military service members and their families from

15

their homes, thus causing a host of deleterious effects on their lives and the lives and wellbeing of their family members. These effects include, without limitation, affecting how Plaintiffs and Class members perform their military job duties. During these long-term remediation projects, Defendants continue to take Plaintiffs' and Class members' BAH every month as rent, despite the fact that Plaintiffs and Class members, and their families, have been forced to live in hotels or other accommodations that are far smaller and more inconveniently located than the homes for which they are paying.

57.     Additionally, Defendants' remediation efforts often fail to fully address the severe moisture and mold problems in the housing at MacDill AFB, as Class members have found continued high mold readings in their homes even after remediation was purportedly performed by Defendants.

C.     **Plaintiffs' Experiences with Moisture and Mold at MacDill AFB**

**The Lenz Family**

58.     Plaintiff Joshua Lenz is a Master Sergeant in the United States Air Force.

59.     Master Sergeant Lenz is married to Plaintiff Traci Lenz. They have three minor children, M.L., age 17; B.L., age 13; and G.L., age 3.

60.     In early June 2018, Master Sergeant Lenz signed a one-year lease with Defendant AMC to reside on MacDill AFB at 1805 Billy Mitchell Loop, Tampa, Florida (the "Lenz Lease"). The Lenz Lease specifically acknowledges the importance of controlling moisture to prevent mold and directs the tenant to report "any evidence of excessive moisture or mold or mildew inside the dwelling unit."

16

61.     Pursuant to Defendants' procedures, the Lenzes were not permitted to walk through the residence prior to moving in. They were only able to view the floor plan, although this was not even an exact layout of the house that they were renting.

62.     On June 28, 2018, the Lenz family moved into 1805 Billy Mitchell Loop.

63.     During their move in, the Lenzes made a video detailing the poor living conditions in the home. For example, vents were dirty; a toilet did not flush; and the dishwasher was infested with maggots.

64.     The Harbor Bay housing office told the Lenz family to run bleach through the dishwasher, but this did not thoroughly clean the appliance. The Harbor Bay housing office also reassured the Lenzes that the spots on their vents were dust or a typical and harmless Florida mold, which could be addressed by simply wiping it with bleach.

65.     After moving in, the members of the Lenz family began to experience various health symptoms, including itchy throats and burning eyes, coughs, headaches, and difficulty breathing. These symptoms slowly worsened over time. Their youngest child, G.L. (age 3), was taken to Urgent Care on July 5, 2018, only two days after moving in, for an upper respiratory infection and ear infection.

66.     B.L. (age 13), who had a preexisting immune disorder but who had maintained a stable immune function for the four years prior to moving to the home at MacDill, also began to experience headaches, itchy and sore throat, and runny nose.

67.     The Lenzes then noticed that spots on the vents had returned and made a request for Harbor Bay's maintenance personnel to address the problem. Because of on-going health issues with members of the family, the Lenzes thought that there might be a connection to the conditions in their house and realized that spots found on vents could be an issue related to mold.

68.     It took three calls before a Harbor Bay maintenance worker was dispatched to the Lenzes' home. The worker eventually came and cleaned the vent covers and told the Lenzes that a duct cleaning was needed and that they would be put on a list.

69.     On October 24, 2018, the Lenzes called Harbor Bay to request a mold inspection. The Lenzes advised Harbor Bay that something was still on their vents. The Lenzes were told they would be placed on a list for duct work cleaning.

70.     When the Harbor Bay maintenance worker finally came to the Lenz home, the worker only cleaned vent covers for visibly affected areas. Harbor Bay did not conduct an adequate inspection, nor did it clean the duct work. The maintenance worker, however, did observe and remark upon the sloping floors in the house.

71.     On January 3, 2019, the Lenzes found mold growing on the inside of their vents and placed another call to Harbor Bay maintenance.

72.     At 6:30 p.m. that day, a worker arrived unannounced and did not clean anything but told the Lenzes yet again that they would need to be placed on a list for vent and duct cleaning. The worker stated that someone would call the family the next day. The worker then closed the vents and told Mrs. Lenz to keep the vents closed until the vents were cleaned.

73.     The next day, January 4, 2019, Traci Lenz bought testing kits and tested water, mold, and lead in the house.

74.     When no one from Harbor Bay called the family on January 4, 2019, as promised, Mrs. Lenz placed a call to the Harbor Bay office. The representative in the housing office told Mrs. Lenz that no list for vent and duct cleaning existed.

75.     Later that same day, a Harbor Bay representative called the Lenzes to advise them that Harbor Bay would conduct a mold inspection – which was then more than two months after the Lenzes first complained to Harbor Bay of mold problems in their home.

76.     Harbor Bay maintenance came to the house on January 8, 2019 to test for moisture and inspect the house. The inspection performed by Harbor Bay did not include an examination of the inside of the Lenzes' ducts or of the HVAC system. Instead, the inspection only included checking under toilet lids, under sinks, and around vents, and testing certain limited areas with a moisture meter.

77.     The maintenance worker reported that only one area was found to have moisture from a crack in the stucco; this was a coincidental discovery that the Lenz family was unaware of and would have gone undetected without the Lenzes' demand for an inspection.

78.     Harbor Bay thereafter informed the Lenzes that they would be moved to a hotel while Harbor Bay's agents conducted a mold remediation at the home. Pursuant to the terms of the lease, Defendant AMC was required to pay for temporary lodging costs for the Lenzes while they were displaced from their home. Harbor Bay tried to send the Lenzes to a hotel an hour away from MacDill AFB and told the family that there was nothing available in the Temporary Lodging Facility ("TLF") on the base.

79.     In fact, however, lodging was available at the TLF, and the Lenzes were able on their own to arrange temporary housing at the TLF. The Lenzes were required to pay for the TLF stay out-of-pocket, as Harbor Bay left no payment method on file despite telling the Lenz family otherwise. Harbor Bay paid for the Lenzes TLF for the first week only.

80.     On January 9, 2019, the Lenzes stopped by their house to check on the progress of ServPro, the cleaning company used by Harbor Bay, and to retrieve extra items for their children

19

to use at the hotel. The Lenzes found that no venting to the outside was being used for the mold remediation, which they believed was improper. Also, the upstairs carpets were pulled back in two of the childrens' rooms and chunks of the pressboard flooring were cut out and missing.

81.    On January 10, 2019, the Lenzes returned to their home but were locked out without notice. After Master Sergeant Lenz was able to gain access to his home, he found that there was a plastic sheet apparently being used as a mold remediation barrier on a bathroom door. He was told that there was mold in the drywall surrounding the bathroom ceiling vent. Traci Lenz also noticed that there was mold on the vent cover that had been painted over. The family had asked to be notified in advance of further remediation so that they could move their personal belongings before risking them to exposure. Harbor Bay ignored this request.

82.    That same day, Nick Leabo from Harbor Bay called to extend the Lenzes' hotel stay due to further damage and remediation that had been identified as being needed. Subsequently, however, John Gausche from Harbor Bay denied this via a text message and stated that the framing just needed to dry out and that the family could likely return to their home the next day.

83.    Despite Mr. Gausche's statements, Harbor Bay found more mold on January 11, 2019, and the remediation area again was expanded. The Lenzes requested photos but never received them, and their hotel stay was extended again.

84.    Master Sergeant Lenz thereafter contacted Harbor Bay to inquire about moving to another residence. The representative at Harbor Bay stated that moving to another residence was not possible and therefore that the Lenzes would have to remain in their mold-infested home.

85.    On January 11, 2019, Traci Lenz spoke with the previous tenants of 1805 Billy Mitchell Loop, and learned for the first time that the home had flooded on three separate occasions

20

in 2017, with water entering the HVAC unit each time. Harbor Bay never disclosed this information to the Lenzes before the Lenz Lease was signed or before the family moved in.

86.     On January 14, 2019, Master Sergeant Lenz requested the records of prior issues with the house. Harbor Bay denied the request. Harbor Bay representative John Gausche informed the family that he saw signs of previous mold remediation but did not find moisture in areas where Traci Lenz indicated there was a mold odor.

87.     On January 15, 2019, the Lenz family returned to their house, but it was uninhabitable. Mold and dust contaminated the fan that was now hanging loose in the bathroom. A layer of drywall dust covered everything in the home. Harbor Bay sent maintenance to clean and told the Lenzes that these conditions were merely small oversights.

88.     Traci Lenz begged Harbor Bay to send the Lenzes back to a hotel so the house could receive a full cleaning. The Lenzes could tell that their HVAC filter was new but saw it was obvious the ducts and vents had not been cleaned. Harbor Bay falsely maintained that the house was 100% safe to occupy.

89.     On January 16, 2019, the ServPro worker came to the house to vacuum the air return and clean the air intake vent. ServPro and Harbor Bay again stated that the house was safe, and the ServPro worker told Traci Lenz the duct work had been cleaned.

90.     Later that day, Mrs. Lenz received the lab results for two of the independent tests from January that she had initiated. Five types of mold were present, and some were strains that could produce dangerous mycotoxins and cause illness, especially in people with compromised immune function or breathing issues such as their child, B.L.

91.     Due to adverse health symptoms being exhibited by the family, Traci Lenz became suspicious that the duct work was never cleaned and that there was still mold in the house. The

Lenzes removed several vent covers that had been replaced during the "cleaning" and discovered filthy duct work.





92.      The discovery of these conditions after the Lenzes had been told that the duct work had been cleaned caused the Lenzes to question the safety of themselves and their children.

93.      Based on the failure of Harbor Bay to properly clean their home, the Lenzes emailed Harbor Bay again and requested to terminate their lease early, copying Master Sergeant Lenz's chain of command.

94.      On January 17, 2019, the family placed security cameras outside the house with a note at the door requesting a telephone call before anyone entered the house, as no one from Harbor Bay had yet called back to address the moldy vents.

95.      Later that same day, the family secured an on base hotel for the week by paying out of pocket and began to search for a new rental home.

96.      Over the next several days, the Lenz family had to change hotels several times and could not return to their home. Harbor Bay still had not responded to the request to move to a new home but stated that they would meet with the Lenzes to view the unsatisfactory work in the house.

97.      The Lenzes asked Harbor Bay to pay for a move and fund a temporary hotel so the Lenzes were not required to spend significant time in the house during the relocation. Harbor Bay did not respond.

98.      Harbor Bay staff entered the house on January 18, 2019 without providing notice to the Lenzes. On other occasions, when a housing manager would send a text, Master Sergeant Lenz arrived at the house within five minutes and management was already inside the house.

99.      Harbor Bay did a visual inspection only and the Lenzes requested that no further work be done until they could remove their personal items to prevent further mold contamination. Harbor Bay asked if the family was still sleeping in the home, and then told the Lenzes that "management" would be in touch.

23

100.    The evening of January 18, 2019, Harbor Bay informed the Lenzes that they could only move to a new home *if they signed a release of all claims and a Nondisclosure Agreement in regard to themselves and their sick children*. The Lenzes refused to do so.

101.    Traci Lenz learned from another military spouse residing at MacDill AFB that Harbor Bay's John Gausche was not actually from maintenance or management, but rather had been brought in to deal with ongoing moisture and mold issues at MacDill AFB.

102.    As posted on his LinkedIn profile, https://www.linkedin.com/in/john-gausche-976070160/, John Gausche has served as the Regional Facility Director at Defendant The Michaels Organization since 2010.

103.    By January 21, 2019, the Lenzes found an available rental that was smaller and more expensive than their house, but they decided to accept it in order to protect the health and safety of themselves and their children. They began packing their belongings and experienced the usual symptoms of burning eyes and chest during the process.

104.    On January 22, 2019, a representative of Harbor Bay stated that it did not have any reports of past water or mold problems with respect to the Lenzes' house. Harbor Bay also refused to pay any moving or hotel expense based on the Lenzes' claim. The Lenzes were dissatisfied with Harbor Bay's repeated refusals to repair the home and to properly remediate the moisture and mold problems.

105.    Unsatisfied with Harbor Bay's repeated failures to repair and remediate the moisture and mold issues in their home as required by the lease, the Lenzes hired Certified Mold Assessments ("CMA") to perform testing in their home. CMA took swabs and ran reports on January 23 and 24, 2019. The tests returned extremely high mold counts, and a more extensive

report was ordered. CMA reported that there was visible mold in the HVAC closet and on vents, ducts, and the handler.





106.     During the next week, movers arrived to assist in taking large items out of the house. The movers told Traci Lenz that they were moving one family after another out of MacDill AFB military housing due to rampant mold problems on the base.

107.     On January 28, 2019, Harbor Bay finally responded to the Lenzes and stated that the Lenzes could move out as an accommodation, but still falsely claimed that there were no habitability or mold issues. A move out date was set for January 30, 2019.

108.     On January 29, 2019, the Lenzes took a walk-through video of the home after their cleanout.

109.     In the first week of February 2019, the full mold inspection reports from CMA were provided to the Lenzes. These reports indicated that there were twenty-three types of mold, and eight of the mold types were associated with water damage. Reoccupation of the home was not recommended based on the proliferation of mold and the high mold counts.

110.     On February 21, 2019, the Lenzes met with Harbor Bay management and were promised transparency and resolutions. These promises were never fulfilled.

111.     On February 27, 2019, Traci Lenz stopped by the house to see work being done on the house. Remediation tarps were hanging unsealed, moldy cabinets were exposed, and the HVAC handler was sitting outside.

112.     The Lenzes have since sent mold reports, damaged household inventory, and medical reports to Harbor Bay, but have not received reimbursement or compensation for the horrific living conditions to which their family was subjected, for their associated pain and suffering, for their unreimbursed expenses, and to compensate them for all of their inconveniences suffered.

26

113.    Prior to moving into Harbor Bay housing in June 2018 on MacDill AFB, the Lenz family enjoyed an active lifestyle.

114.    Master Sergeant Lenz has lung, liver, and spleen damage that his doctors have associated with mold exposure. He has a conglomerate, long-mass lung nodule and skin rashes. He also suffers from early pulmonary obstruction and reduced lung function.

115.    Traci Lenz has received medical treatment for breathing issues and a sore throat, as well as pneumonia-like symptoms. The problems were identified as allergic reactions, and a concern for Traci Lenz's lung health has been noted. She has also received treatment for ongoing coughing, and she had a neurological MRI that shows brain changes associated with exposure to a water damaged building. She has ongoing concerns with memory, word confusion, brain fog, and headaches.

116.    M.L., age 17, developed spots on her skin and in her throat that were recommended for biopsy. She was referred to specialists over these concerns, and the skin spots returned abnormal melanoma cells.

117.    B.L., age 13, exhibited a rash on her skin and had her immune function retested. The results revealed that after four years of stability, her immune function had decreased. She has a lump on her wrist that is being actively monitored. In addition, while living at the MacDill AFB house, she was also diagnosed with anxiety and depression and suffered from frequent infections.

118.    G.L., age 3, began to get ill frequently starting just two weeks after moving into Defendants' MacDill AFB military housing. Even after moving away, the child continues to struggle with cognitive development and neurological episodes and suffers from unexplained seizures. While living at MacDill AFB, the child required ear tube surgery and had a hospitalization for croup. The child was also diagnosed with reactive airway disease and had

27

frequent infections. The child also has frequent allergic reactions, although the allergy symptoms have decreased since moving out of the affected housing. In February 2019, the University of South Florida Allergy and Immunology advised that many of G.F.'s issues were likely due to mold exposure, and that the only way to rectify the problems was to move out of the home.

119.    In total, the Lenz family has spent nearly $28,000 dollars on unreimbursed out-of-pocket expenses and continues to deal with emotional and medical effects from living in the contaminated, substandard housing that Defendants touted as being fit for a family.

### The Norquist Family

120.    Plaintiff Jason Norquist is a Special Forces Officer ("SFO") in the United States Army.

121.    SFO Norquist is married to Plaintiff Amie Norquist, and they have four children: A.N., age 12, J.N., age 7, E.N., age 4, and E.N., age 1.

122.    In July 2018, SFO Norquist signed a lease with Defendant AMC and moved to 8326 Marauder Drive, Tampa, FL, a home owned and managed by Defendants and located on MacDill AFB.

123.    By August 2018, the Norquists noticed that their children were getting sick more often than usual.

124.    The Norquist children's pulmonologist accredited their breathing and lung issues to mold exposure. In December 2018, a second doctor accredited E.N.'s medical symptoms to mold exposure. A third doctor, E.N.'s pediatrician in North Carolina, confirmed with the Norquists that he believes that mold exposure is a direct cause of the medical symptoms suffered by the Norquists' children.

125.    After the Norquists made multiple requests to Defendant Harbor Bay to conduct a mold inspection, Harbor Bay finally agreed to send a mold inspection specialist in September 2018.

126.    During the subsequent inspection of the Norquist home, Defendants' agents found high levels of moisture throughout the main living area flooring, the children's bathroom upstairs, and the flooring and ceiling in another room. These high levels of moisture constituted an ongoing defect of the rental home.

127.    The Norquist family was moved into temporary lodging for two weeks at the end of September 2018 and beginning of October 2018, while work began on their home by a remediation company called Damage Recovery.

128.    Toward the end of the remediation, the Norquists entered their home to inspect the progress only to discover that their belongings were not being properly protected from the toxic mold spores and cleaning agents being used by Damage Recovery.

129.    Upon returning to the home in mid-October 2018 following remediation, the Norquists discovered a layer of black dust covering much of their home and belongings.

130.    Within a few days, Harbor Bay was back in the Norquists' home to discuss a new remediation strategy after admitting the failure of the first "remediation."

131.    A representative of Harbor Bay told the Norquists that their belongings and carpets were contaminated and that Harbor Bay would now use a different company for remediation.

132.    Harbor Bay planned to place the Norquists into the company's hospitality suite on the MacDill AFB at the end of October 2018. This, however, did not occur because the hospitality suite also was contaminated with mold.

29

133.    For the next two months, November and December 2018, the Norquists lived in temporary housing, including first a hotel and then an apartment.

134.    The Norquists report that the more Harbor Bay worked on their home, the more mold was discovered within the subflooring and building materials.

135.    In December 2018, the Norquists petitioned the Commander of the MacDill AFB to authorize the family's move off-base.

136.    By late December 2018, the Norquists moved into an empty rental home approximately forty-five minutes from MacDill AFB with almost just the clothes on their back.

137.    The Norquists' estimated loss in household goods damaged due to mold contamination exceeds $60,000, for which they have not been reimbursed by Defendants.

138.    The Norquists also have incurred additional unreimbursed out-of-pocket expenses, including, without limitation, by accruing debt for temporary lodging and paying costs to replace basic amenities for daily life. They have also lost over $800 worth of specialized supplements and medicine for their daughter after Harbor Bay left open the door of the Norquists' refrigerator for an extended period of time during the remediation process.

139.    Prior to moving onto MacDill AFB military housing, the Norquists were a healthy family with the exception of their youngest daughter, who was in remission from Eosinophilic Esophagitis. Now, SFO Norquist suffers from respiratory issues with an ongoing cough. He has also been pulled from his six-month deployment due to the severity of his health issues and the family's transient status.

140.    Amie Norquist suffers with an ongoing cough and periodic episodes of memory loss. An MRI has recently shown that she has atrophy in certain areas of her brain and inflammation consistent with exposure to toxins.

141.    The Norquists' oldest daughter has undergone two lung procedures and was prescribed an airway clearance vest, which she will likely have to use for the foreseeable future. She has also experienced severe emotional trauma from the entire ordeal at MacDill AFB and is now under the care of a therapist. Pursuant to her doctor's recommendations, she has been removed from school and is now home-schooled due to her environmental sensitivities and emotional distress developed as a result of her mold exposure.

142.    The Norquists' youngest daughter also battled persistent health issues while living on MacDill AFB in Defendants' rental housing. She has been diagnosed with arthritis and lupus, which her doctors believe to be a result of severe mold exposure.

143.    The Norquists' oldest son has suffered from upper respiratory infections and was hospitalized due to myositis, and lost the use of his legs for several days.

144.    The Norquists' youngest son has suffered repeat infections and bouts of respiratory illness which required numerous emergency room visits.

145.    The Norquists have not received reimbursement or compensation for the horrific living conditions to which their family was subjected, for their associated pain and suffering, for their unreimbursed expenses, and to compensate them for all of their inconveniences suffered.

### The Morgan Family

146.    Plaintiff Ryan Morgan is a Staff Sergeant in the United States Air Force. Staff Sergeant Morgan is a Network Operations Technician at MacDill AFB.

147.    Staff Sergeant Morgan is married to Plaintiff Erica Morgan. They have two children: L.M, age 7; and S.M., age 2. Prior to moving into housing owned and operated by Defendants on MacDill ADB, the Morgans were an energetic family and enjoyed being outside.

31

148.    On February 22, 2019, Staff Sergeant Morgan signed a Florida Lease Agreement ("Morgan Lease") with Defendant AMC. The Morgan Lease was signed by Defendant MMS as agent for AMC.

149.    As part of his initial lease paperwork, Staff Sergeant Morgan was provided with a copy of the MacDill Handbook, including the Resident Tip Sheet on Mold.

150.    On or about March 2, 2018, the Morgans moved into 8522 Levitow Street, located on MacDill AFB in Tampa, Florida.

151.    After moving in, the Morgans began to experience decreased energy levels, allergies, asthma, rashes, and other health concerns. Staff Sergeant Morgan developed a rash around his eye in February 2019. Erica Morgan began experiencing migraines, lethargic energy, and daily "brain fog." The Morgans' two children began to get headaches, nosebleeds, and increased allergic reactions starting shortly after moving into the residence.

152.    In October 2018, after living in the house for several months, the Morgans noticed an issue with the wooden wall in the "backsplash" of their kitchen above the sink. The area was bubbling out. Staff Sergeant Morgan pressed his fingers against the wall and found it was soft and spongy.

153.    Staff Sergeant Morgan called Harbor Bay maintenance to address the problem. A maintenance worker came to the home but merely applied caulk below the windowsill without attempting to remove the section of the wall or identify the underlying source of the moisture problem, which was a defect with the house.

154.    By January 2019, carpenter ants were coming out of the backsplash area. The Morgans again called Harbor Bay maintenance. This time, the Harbor Bay maintenance worker

32

who came to address the issue stated that he would need to call in someone else to look at the problems.

155.    In February 2019, the Morgans were forced to moved out of their home and stay in temporary housing on MacDill AFB while Harbor Bay sought to remediate the problem in their kitchen. Harbor Bay cut out portions of the wall in the kitchen and found visible mold. Harbor Bay also removed a portion of the wall upstairs in the Morgan's daughter's bedroom. However, inexplicably, no containment area was set up in their daughter's bedroom.

156.    On the first occasion when they were forced into temporary housing, the Morgans stayed in the TLF for approximately one week. They did not receive any pro rata reimbursement of their BAH during this time period despite that they had been forced out of their home and the temporary living facility did not provide comparable accommodations.

157.    In April 2019, one of the Morgans' children's rocking chair punctured a portion of the wall under a windowsill in the living room. The family then realized that the drywall had severe moisture damage and performed their own spot check and discovered that every wall around the windows in the house had severe moisture damage. The Morgans immediately called and placed a work order with Harbor Bay to have these issues addressed.

158.    Following their calls to Harbor Bay, the Morgans were forced to vacate their home for a second time due to the moisture and mold problems, to allow remediation to take place. From May 12, 2019 to May 31, 2019, the Morgans were relocated to the Residence Inn – Westshore, while Harbor Bay ripped out and replaced the drywall in their kitchen, living room, master bedroom, their two daughters' bedrooms, and air ducts on the first floor living area. Harbor Bay, however, never identified to the Morgans an underlying cause for the rotting drywall and severe moisture issues, and a representative from Harbor Bay maintenance told the Morgans that Harbor

Bay did not know the cause. As a result, the Morgans had reason to believe that the problems would reoccur.

159.    On May 23, 2019, Staff Sergeant Morgan pointed out that the necessary full inspections and remediation work had not been done during the prior remediation. Harbor Bay claimed that the punctured portion of the wall had been damaged by one of its own employees during remediation.

160.    While staying in the hotel in May 2019, Staff Sergeant Morgan requested that Defendants permit the Morgan family to move to a different house on MacDill AFB. The request was denied by Harbor Bay. The Morgans eventually were forced to move back into the defective and moisture and mold-infested home on Levitow Street.

161.    On August 15, 2019, the Morgans noticed moisture coming from their flooring surrounding the refrigerator. They pulled back the refrigerator and saw visible mold growth on the baseboards behind the refrigerator. The cannister for producing ice was faulty and was leaking causing the moisture around the refrigerator. Maintenance workers were called to the home and proceeded to remove baseboard with visible mold growth. The following pictures show the baseboard and flooring with mold growth.







162.   The Morgans were once again forced to vacate their home while Defendants purported to again attempt to remediate the mold problem. This time, the Morgans were out of their home for more than a month, from August 16, 2019 to September 18, 2019. The Morgans were initially placed in the Residence Inn in Brandon, Florida, more than 20 miles from MacDill AFB. They were then moved to the Residence Inn at West Shore Airport, approximately eight miles from MacDill AFB.

163.   During their month-long stay at the Residence Inn, the Morgans and their two daughters had only two bedrooms and a living area with a small kitchen, as opposed to their three-bedroom home with a full kitchen.

164.   In total, the Morgans were forced to spend 58 days out of their home between February and September 2019, or more than 25% of the days during that time period.

165.   As a result of the continued moisture and mold problems in their home, the Morgans requested that Harbor Bay conduct adequate and full testing and provide them with the test results. A mold specialist associated with Harbor Bay, Apollo Environmental, Inc., came to the home and collected biological surface samples. The test was completed through EMSL Analytical, Inc. in August 2018. The Harbor Bay mold consultant had no badge or documents and refused to test certain areas where Erica Morgan indicated that she saw mold, saying that the federal Office of Safety and Health Administration (OSHA) did not require him to do so.

166.   The Morgans subsequently hired an independent mold specialist, from Indoor Air Quality Services.

167.   During August 2019, Harbor Bay finally agreed to let the Morgans move to a different home on MacDill AFB, and in September 2019, Harbor Bay provided the Morgans with a new home on base. Harbor Bay instructed the family to leave behind any upholstered household

items such as sofas and said that Harbor Bay would determine if they needed cleaning or replacement.

168.    The family washed every single piece of clothing and linen item before bringing them into their new residence and wiped down all other personal items.

169.    All members of the Morgan family have experienced a decline in their health since living in Defendants' housing at MacDill AFB. Staff Sergeant Morgan has aggravated allergies, a skin rash, and shortness of breath. Erica Morgan has been placed on medication for nausea, insomnia, and shortness of breath, and been referred off base to a specialist. L.M., age 7, has aggravated allergies, shortness of breath, coughing, and itching. S.M., age 2, suffers from a rash on her face.

170.    Staff Sergeant Morgan's physician has explained that the skin rash and other symptoms are consistent with mold exposure. Staff Sergeant Morgan is continuing to receive medical care. Prior to moving into Defendants' housing at MacDill AFB, Staff Sergeant Morgan had common allergies to dust mites and shellfish but nothing like the reactions he suffered as a direct result of living in the moisture and mold-infested housing at MacDill AFB.

171.    In addition to suffering from rashes and other allergies, Staff Sergeant Morgan suffers from fatigue and low energy. He now gets tired easily and goes to sleep at around 8:00 p.m. when he used to stay up until much later; yet feels like he has still not gotten enough sleep.

172.    In addition to their continuing health problems, the Morgans have been forced to spend thousands of dollars as a direct result of Defendants' failure to provide them with a habitable home. These expenses include the purchase of new, uncontaminated mattresses for themselves and their daughters, charges for furniture cleaning and mold testing, and costs for air filters. The Morgans, like other Plaintiffs and Class members, also suffered unreimbursed out of pocket

damages in the form of mileage, extra gas, extra meals eaten outside of the home, and other incidentals while they were forced to live outside their home.

173.     The Morgan family is now living in a second home at MacDill AFB. The new home has a distinct odor that leads the Morgans to believe that there is mold in the house. The Morgans believe that Harbor Bay performed a remediation of some kind on their new home before the Morgans moved in, as there is visible work around some of the air ducts, but Defendants have not provided an accounting of all of the work performed on the house to the Morgans. On November 22, 2019, the Morgans met with Harbor Bay management and its environmental specialist and have scheduled replacement of the HVAC unit and remediation in the downstairs closet.

174.     When the Morgans sit on some of their furniture in the new home, they notice an adverse reaction.  The reaction is worse when the air conditioner is running.

175.     Staff Sergeant Morgan and his wife remain very concerned for their family. Moreover, the Morgans have not received reimbursement or compensation for the horrific living conditions to which their family was subjected, for their associated pain and suffering, for their unreimbursed expenses, and to compensate them for all of their inconveniences suffered.

### The Elbon Family

176.     Plaintiff Gary Elbon is a Staff Sergeant in the United States Air Force working as a Criminal Records and Data Manager for the Security Forces Squadron.

177.     Staff Sergeant Elbon is married to Plaintiff Kayla Elbon. Together they have three young children: A.B, age 12, S.B., age 9, and A.E., age 6.

178.     The Elbons moved from Montgomery, Alabama to MacDill AFB in Tampa, FL, on April 1, 2016, after Staff Sergeant Elbon signed a lease with Defendant AMC.

179.    In February 2018, the Elbons noticed that their HVAC unit was leaking, and informed Defendant Harbor Bay, but it was unresponsive. The Elbons cleaned up the water from their leaking air conditioner unit. Harbor Bay eventually sent a maintenance team to the Elbons' home who brought small fans to set on the wet carpet. Harbor Bay told the Elbons that additional maintenance personnel would be dispatched to follow up with the water build up, but no one ever came. Multiple work orders were sent by Staff Sergeant Elbon. In response, Harbor Bay provided only excuses and gave the Elbons the run around.

180.    In April 2019, the Elbons' air conditioner unit again began leaking, ultimately leaking 40 gallons of water onto their floor, and then into the carport below. As a result of the leak, the flooring in the Elbon home became warped and discolored. In response, Harbor Bay simply dispatched a carpet cleaning company, Tampa Bay's Best, to clean up the water.

181.    Numerous work orders were then submitted by Staff Sergeant Elbon, which Harbor Bay also ignored. Harbor Bay informed the Elbons that someone would come out to conduct further remediation, but no one did. Staff Sergeant Elbon has time stamps matching the dates of his submitted work orders that were closed by Harbor Bay without addressing the issues.

182.    Harbor Bay eventually made a purported remediation effort limited to simply replacing some of the flooring, that required the Elbons to vacate their home. During the summer of 2019, the Elbons spent 39 days in a single hotel room while Harbor Bay conducted this remediation process.

183.    After returning to their home, the Elbons discovered mold in their kitchen flooring in August 2019, and immediately informed Harbor Bay.

184.    Harbor Bay informed the Elbons that they would have to move out of their home while Harbor Bay sought to address the problem.

39

185.    When the Elbons requested that Harbor Bay's remediation company test for mold, the company prevented testing as it instead chose to dispose of the flooring.

186.    The damage to the Elbons' home turned out to be extensive. The HVAC, which had only one drain line and no secondary line – a building defect – was clogged and backed up – a maintenance defect – causing the extensive leak. The cheap and defective laminate flooring trapped the water from the leaking HVAC. The flooring in the Elbons' kitchen had to be completely ripped out, as did the ceiling of the carport below. As shown in the picture below, extensive evidence of mold was found.



187.    The Elbons conducted two inspections prior to moving back into their home. They originally scheduled the first inspection while Staff Sergeant Elbon was on a TDY (Temporary Duty Assignment) to Patrick Air Force Base. Staff Sergeant Elbon requested that this inspection be pushed back three days so that he could attend the inspection upon his return. Harbor Bay,

however, ignored this request. Nevertheless, Kayla Elbon discovered more mold at the inspection and Harbor Bay had to extend the family's stay at a hotel.

188.    When the Elbons moved back into their home in September 2019, the musky smell of mold was still in the kitchen area. In addition, the floors were still warping.

189.    Harbor Bay eventually dispatched two mold companies to conduct further testing at the Elbons' home.

190.    Despite numerous requests to Harbor Bay by email, phone and in person, the Elbons have yet to receive the mold testing results.

191.    Prior to the Elbons' moving to MacDill AFB, they had no significant medical conditions; however, that changed as a result of their living in the defective military housing provided by Defendants. Staff Sergeant Elbon has now been referred out to a pulmonologist, has been admitted to the emergency room for lung problems, and recently had a CAT scan on his chest which found fluid around his heart.

192.    The Elbons' three children all suffer from rashes and have been referred to an allergist. Their two daughters suffer with a mucus-producing cough, vomiting and nausea. They also had to miss school to attend urgent care for the rashes on their skin.

193.    The Elbons currently reside on MacDill AFB in their mold-contaminated and unsafe home. Defendants continue to be unresponsive and have failed to effectively remediate the defective conditions in the home.

194.    The Elbons' estimated loss in household goods damaged due to mold contamination and other unreimbursed out of pocket damages is in excess of $47,000. The Elbons have not been reimbursed or compensated by Defendants for their damages.

195.    In addition, the Elbons have not received reimbursement or compensation for the horrific living conditions to which their family was subjected, for their associated pain and suffering, for their unreimbursed expenses, and to compensate them for all of their inconveniences suffered.

### The Genrich Family

196.    Plaintiff Jason Genrich is a Chief Warrant Officer Three ("CW3") in the United States Army serving as a technical expert in intelligence and tasked with important intelligence duties. CW3 Genrich joined the Army in April 2002 and has been deployed four times: twice to Iraq, once to Afghanistan, and once to Jordan. Like the other Plaintiffs who are members of the military at MacDill AFB, he has served and continues to serve his country honorably and devoted his life to doing so.

197.    CW3 Genrich is married to Plaintiff Jenny Genrich.

198.    The Genrichs arrived at MacDill AFB in July 2018, having transferred from Fort Bragg, which is located in North Carolina. Prior to moving to MacDill AFB, CW3 Genrich had a physical check-up and was given a clean bill of health with no identified issues.

199.    On July 17, 2018, CW3 Genrich signed a lease (the "Genrich Lease") listing Defendant AMC as the owner and Defendant Michaels Management Services, Inc. as AMC's agent. As part of the documents included with the Genrich Lease, CW3 Genrich also signed a Mold Addendum listing "Harbor Bay" as the "Owner."

200.    On August 22, 2018, the Genrichs moved into 8412 Tampa Point Blvd., a house located on MacDill AFB developed and managed by Defendants. Pursuant to Defendants' procedures, the Genrichs were not permitted to inspect the home prior to deciding whether to accept it, other than to drive by. The Genrichs were told by Defendants that this was the only home

available and if they did not accept it, they would be moved to the bottom of the list of service members who had applied for on-base housing at MacDill AFB.

201.    During the walk-through on the day of their move-in, the Genrichs observed that the flooring seemed warped and spongy, and that there was vinyl planking coming up in some areas of the house. The laminate flooring around the kitchen on the first floor was bowed and buckling. The housing representative from Defendant Harbor Bay who was present during the walk-through, Geri Leto, falsely claimed that the flooring was normal for a stilt house in a humid environment like Florida.

202.    The Genrichs also noticed that the walls in the laundry room were stained an ugly brown color.

203.    The Genrichs, however, wanted to move into the home on Tampa Point Blvd. because from the outside, the house looked nice, and because of the proximity of the house to CW3 Genrich's work (allowing the Genrichs to have lunch together as they liked to do often), and because of other amenities such as the on base hospital and commissary. In addition, the Genrichs liked being part of the MacDill AFB community, including the socialization, comradery, safety, and security.

204.    Almost immediately after moving into their home on MacDill AFB, CW3 Genrich began having health problems, including headaches, fatigue, respiratory issues, and difficulty performing his normal physical training ("PT").

205.    On October 1, 2018, CW3 Genrich woke up in the middle of the night with sharp pain in his chest, right arm, and neck, dizziness, lightheadedness, fatigue, and shortness of breath. He did not want to take risks so called the TRICARE hotline for triage. The nurse said it did not

sound like a heart attack but recommended that CW3 Genrich go to Tampa General Hospital to be checked out.

206.    Plaintiff Jenny Genrich took CW3 Genrich to the emergency room at Tampa General Hospital. After six hours of testing and observation, including a battery of blood tests, two EKGs, and a chest scan, the hospital concluded that Genrich had not had a heart attack or other cardiac event. However, the hospital otherwise did not know what was going on or what had caused CW3 Genrich's serious symptoms. CW3 Genrich was discharged and advised to follow up with his Primary Care Manager ("PCM") in the Army.

207.    Over the next several days, CW3 Genrich began having memory issues and mood swings as additional medical symptoms and also began waking up in the middle of the night. At this time, neither he nor Mrs. Genrich had any idea what was causing his symptoms.

208.    On October 4, 2018, CW3 Genrich saw his PCM, who reviewed the test results from Tampa General Hospital, conducted an examination, and concurred with the diagnosis that CW3 Genrich had not suffered a heart attack or cardiac event. The PCM referred CW3 Genrich to specialists off-base for further medical examination.

209.    On October 17, 2018 the Genrichs noticed a light fixture leaking water in their home. Jenny Genrich contacted Harbor Bay who sent a maintenance person the following day. The maintenance person advised that the air conditioner was clogged with long-term debris build up but did not indicate what kind of debris it was.

210.    In addition to his previous symptoms, CW3 Genrich began experiencing lack of concentration, memory issues, migraines, and irritability. Over the next five months, CW3 Genrich was sent to four specialists: a pulmonologist, a cardiologist, a neurologist, and a hearing and balance specialist. For the first time in seventeen (17) years of military service, he was placed on

an "extended profile," meaning he could not participate in regular physical training or deploy. The pulmonologist and cardiologist cleared CW3 Genrich's lungs and heart, respectively, and determined they were not the issue.

211.    Meanwhile, in November 2018, Jenny Genrich also began experiencing serious medical issues. Her symptoms included swelling and a burning sensation in her throat and chest, and ongoing rashes on her arms, hands, and chest. She also began to experience headaches on a frequent basis. Below is a picture of the rashes that Mrs. Genrich began to experience.



212.    In late 2018, the Genrichs noticed additional and worsening problems with the warped and spongy flooring in their home and reported it to Harbor Bay in person to address the

issue. Harbor Bay retained another company, Damage and Recovery, to come to the Genrichs'
house and conduct moisture testing. Subsequently, two additional moisture readings were
conducted. All came back with high readings for moisture, a common indicator of the possible
presence of mold.

213.    Following this testing, Harbor Bay determined that the flooring in the Genrich
home needed to be replaced. The Genrichs were told they would be placed in a hotel for one to
two weeks at the expense of Harbor Bay.

214.    Harbor Bay scheduled a discussion for the repairs and hotel stay on January 17,
2019, and the remediation was scheduled to begin on February 11, 2019, with the Genrichs to be
placed in an on-base hospitality suite at MacDill AFB. Harbor Bay, however, then notified the
Genrichs that the remediation was being rescheduled to begin on March 12, 2019.

215.    On February 21, 2019, the Genrichs attended a town hall meeting and were
devastated to hear stories of mold contamination across Defendants' housing at MacDill AFB.

216.    Jenny Genrich called Harbor Bay the next day and demanded to have her home
cleaned and repaired without further delay. The Genrichs were placed in a hotel on or about
February 22, 2019.

217.    On February 27, 2019, CW3 Genrich visited his neurologist and informed her of
the mold cleaning and floor replacement. After reviewing his medical records and tests from the
other specialists, the neurologist immediately linked CW3 Genrich's symptoms with Sick Building
Syndrome ("SBS") and began a medication regimen to combat his symptoms. The neurologist
began CW3 Genrich on a regimen of four daily pills and an additional medication on an as needed
basis to treat his symptoms.

46

218.    The Genrichs lived in a hotel room for more than a month, from February 22, 2019 through March 23, 2019, while Harbor Bay attempted to remediate the mold problems in the Genrichs' home. Instead of the nearly 1,900 square foot, three-bedroom home that they were paying for through CW3 Genrich's BAH, the Genrichs and their three pets – including their 85-pound dog – were forced to live in a hotel room that was the equivalent of a studio apartment.

219.    During this time, Jenny Genrich visited the home and took pictures and reported what she thought were oversights to a Harbor Bay representative.

220.    While the Genrichs were living in the hotel, some of their symptoms improved and lessened.

221.    The Genrichs returned to their house on or about March 23, 2019. All of their mold exposure symptoms returned within approximately two weeks of living in the home. Jenny Genrich reported this to Harbor Bay who sent a consultant to inspect the home. During the inspection, the consultant found that the HVAC deck was wet.

222.    Despite Harbor Bay promising that the Genrichs' possessions would be barriered and sealed during the mold remediation, the Genrichs found mold growing on their personal items.

223.    The Genrichs hired an independent mold testing company in April 2019. Even after Defendants' purported month-long mold remediation, the tests came back indicating medium to high levels of mold spores.

224.    As a result, the Genrichs were forced to move out of their house again from approximately April 11, 2019 to April 23, 2019.

225.    Following the concerning results of the independent testing and due to their continuing to experience sickness and worsening medical symptoms, the Genrichs ultimately decided to move off of MacDill AFB in April 2019. They currently reside in an apartment that is

47

smaller than their on-base home and requires CW3 Genrich to commute approximately thirty (30) minutes each way to work.

226.    The Genrichs have suffered thousands of dollars of economic damages in the form of unreimbursed expenses, including, without limitation, for independent moisture and mold testing, treatment for mold (which included fogging of their home), a new washing machine because the Genrichs were forced to throw away their Whirlpool Cabrio top-load washing machine, an outdoor table that was outside where mold was growing near the planking of the deck, and the outdoor carpet and grill.

227.    The Genrichs have been living off-base for seven months and continue to deal with the impacts of mold in their lives. Jenny Genrich still break out in rashes and CW3 Genrich's symptoms intensify if they enter an area with mold present.

228.    CW3 Genrich continues to see his neurologist for treatment. In August 2019, he was diagnosed with toxic encephalopathy and began a medical treatment of four daily pills and up to three pills as needed to treat the symptoms.

229.    For the past three months, CW3 Genrich has received nerve block injections in his skull, face, and neck to manage and provide relief from migraines and headaches he experiences on a daily basis. During CW3 Genrich's most recent visit to his neurologist in early November 2019, the neurologist changed his injection schedule from monthly to every three weeks.

230.    Jenny Genrich deals with heightened ongoing anxiety, panic attacks, and nightmares due to the trauma and emotional strain of the family's exposure to mold and the resulting impact on their lives. She is currently receiving treatment for these issues. She also suffers from constant worry that her husband's conditions are degenerative or permanent.

231.    Prior to living on MacDill AFB, the Genrichs enjoyed exploring local cities. CW3 Genrich enjoyed maintaining a lifelong love of playing sports. The medical issues they continue to face have prevented them from enjoying this active lifestyle to the fullest. CW3 Genrich has had his work affected and has been unable to engage in regular physical training, perform other physical aspects of his position as a soldier in the U.S. Army, or to deploy.

232.    The emotional distress of their living situation continues to haunt the Genrichs. Headaches, anxiety, and panic attacks are now common for their household, resulting directly from the stress of undergoing a substandard living condition. As a result of CW3 Genrich's medical problems caused by Defendants' failure to provide a suitable living environment and his inability to perform the physical aspects of his job or to deploy, CW3 Genrich feels like "half a Soldier."

233.    CW3 Genrich's desire is to get past these problems so he can continue being a total Soldier and complete his career and service to our great nation with dignity and honor. It is unclear whether that will be possible.

234.    The Genrichs have not received reimbursement or compensation for the horrific living conditions to which their family was subjected, for their associated pain and suffering, for their unreimbursed expenses, and to compensate them for all of their inconveniences suffered.

## CLASS ACTION ALLEGATIONS

235.    Plaintiffs bring this action under Federal Rules of Civil Procedures 23(b)(2) and 23(b)(3) on behalf of a Class consisting of:

> all current and former military personnel and their family members who resided in housing located on MacDill AFB that was owned, maintained, managed, or operated by any of the Defendants (the "Class").

236.    The Class is so numerous that joinder of all members is impracticable. There are approximately 572 houses on MacDill AFB owned and/or managed by Defendants, and

membership in the Class can easily be ascertained by reference to Defendants' leases and business records.

237.    In this case there are many common questions of law and fact that are susceptible to common answers, and proof through evidence that will be common as to all Class members. These common questions predominate over any questions affecting only individual Class members. These common legal and factual questions include, without limitation:

a.    whether Defendants breached the terms of their leases by failing to provide the Class with a safe and healthy living environment free of moisture, mold, and other hazards;

b.    whether Defendants breached the implied duty of habitability;

c.    whether Defendants' misrepresentations and omissions regarding the presence of moisture and mold and the health and safety hazards presented to the Class violated the Florida Deceptive and Unfair Practices Act;

d.    whether Defendants owed a duty to the Class to remediate and repair the moisture and mold conditions in Class members' homes;

e.    whether Defendants breached their duty to remediate and repair the moisture and mold conditions in Class members' homes;

f.    whether Defendants' failure to remediate and repair the moisture and mold conditions in Class members' homes constituted a constructive eviction;

g.    whether Defendants' failed to have the proper policies and procedures in place to manage the housing at MacDill AFB;

h.    whether Defendants were unjustly enriched through retention of the Class members' BAH payments for rent of inhabitable homes; and

i.    whether Defendants' actions caused the Class damage.

238.    Plaintiffs' claims are typical of the claims of the Class. Each Plaintiff rented from Defendants a home located on MacDill AFB that suffered from moisture, mold, and other hazards, and that was not properly remediated or repaired by Defendants, as did all members of the Class. Furthermore, Plaintiffs and all Class members sustained economic and other injuries including, but not limited to, payments for rent for an inhabitable home, expenses associated with remediating moisture and mold and repairing concomitant damage, and out of pocket costs for temporary housing and other items as a result of Defendants' constructive eviction. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class members.

239.    Plaintiffs are adequate representatives because their interests do not conflict with the interests of the Class they seek to represent, and they have retained Berger Montague PC, a national plaintiffs' law firm that is competent and highly experienced in complex class action litigation to represent them with respect to their class allegations, as well as the Whistleblower Law Firm that is dedicated to protecting the rights of veterans and other victims of injustice. Plaintiffs and their counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel.

240.    A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiffs and the Class. The injuries suffered by each Class member are relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. It would be extremely difficult for members of the Class individually to redress effectively the wrongs done to them. Even if the members of the Class could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation also increases the delay and expense to all parties, and to the court system,

presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, the members of the Class can be readily identified and notified based on Defendants' lease records.

241.    In addition, Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final equitable relief with respect to the Class as a whole under Rule 23(b)(2).

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
**(brought by Plaintiffs Joshua Lenz, Jason Norquist, Ryan Morgan, Gary Elbon, Jason Genrich and all Class members who signed a lease for property on MacDill AFB against Defendant AMC East Communities, LLC)**

242.    Plaintiffs repeat and reallege all preceding allegations as if set forth fully herein.

243.    Plaintiffs Joshua Lenz, Jason Norquist, Ryan Morgan, Gary Elbon, Jason Genrich, and the Class entered into leases with Defendant AMC East Communities, LLC.

244.    Plaintiffs and Class members have complied with all obligations under the leases, including, as applicable, and Mold Addendum.

245.    Pursuant to the terms of the leases, Defendant is required to repair and maintain, in good working order and condition, all electrical, plumbing, and HVAC equipment contained in Plaintiffs' and Class Members' homes. Defendant is also responsible for moisture and mold remediation in the homes and had a duty to remediate and repair any conditions of moisture and mold.

246.    According to the terms of a Mold Addendum attached to and incorporated as part of Plaintiff Jason Genrich's lease, if a condition exists that permits the accumulation of moisture

and/or the growth of mold, Defendant is required to remedy the condition at their own expense. Defendant's obligations include:

      a.  Developing and implementing a scope of work to remedy the condition;

      b.  Inspecting the home and premises to remedy the condition;

      c.  Erect barriers and or provide instructions for the safety of the Class member tenant and others; and

      d.  Provide alternative living arrangements in the event the Class member must vacate the home.

247.    Defendant is and has been on notice of the mold problems in Plaintiffs' and Class members' homes. Each of the Plaintiffs provided Defendant with notice, either in writing or through verbal complaints to Defendant's agents, of moisture and mold problems in their respective homes.

248.    Any purported limitation of liability for Defendant's material breach of the leases as described herein is invalid.

249.    Defendant materially breached Plaintiffs' and Class members leases, including the Mold Addendum, as applicable, by failing to inspect the homes and develop and implement a plan to provide for the safety of Plaintiffs and Class members by remediating mold and to provide alternative living arrangements when necessary.

250.    In addition, Defendant materially breached Plaintiffs' and Class members' leases by failing to ensure the houses were fit for human habitation and by failing to repair leaks and other defects to make each house habitable for human occupation.

251.    As a result, Defendant breached material terms of the leases.

252.    An implied covenant of good faith and fair dealing exists between the parties to a contract. Defendant was obligated to act in good faith, to deal fairly and to adhere to the contractual terms of the leases but failed to do so by the misconduct alleged.

253.    Defendant's breach of the leases has caused damages to Plaintiffs and Class members in an amount to be determined at trial.

## COUNT II
## VIOLATION OF THE IMPLIED WARRANTY OF HABITABILITY
### (by all Plaintiffs against all Defendants)

254.    Plaintiffs repeat and reallege all preceding allegations as if set forth fully herein.

255.    Florida has by statute adopted the implied warranty of habitability. Fla. Stat. § 83.51.

256.    The duty of the landlord is two-fold:

   a.  Prior to possession by the tenant, the landlord has a duty to reasonably inspect the premises, and to make necessary repairs to transfer a reasonably safe dwelling unit, unless the tenant waives the defect; and

   b.  After possession by the tenant, the landlord has a continuing duty to exercise reasonable care in repairing dangerous defective conditions upon the tenant giving notice of their existence.

257.    Defendants warranted that the leased premises would meet ordinary, normal standards reasonably to be expected of living quarters of comparable kind and quality.

258.    The presence of moisture and mold was a dangerous defective condition in Plaintiffs' and Class members' homes.

259.    Plaintiffs provided Defendants with notice of the dangerous and defective conditions, either in writing or verbally to Defendants and/or their agents.

54

260.    Defendants breached the implied warranty of habitability by failing to properly inspect Plaintiffs' and Class members' premises and make necessary repairs to transfer a reasonably safe dwelling unit prior to possession.

261.    Defendants breached the implied warranty of habitability by failing to exercise reasonable care in repairing dangerous defective conditions, including leaks and mold.

262.    Any purported limitation of liability for Defendants' material breach of the leases as described herein is invalid.

263.    As a result of Defendants' breaches of the implied warranty of habitability, Plaintiffs and Class members have suffered damages in an amount to be determined at trial.

### COUNT III
### VIOLATION OF THE FLORIDA DECEPTIVE
### AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.21, *et seq.*
### (by all Plaintiffs against all Defendants)

264.    Plaintiffs repeat and reallege all preceding allegations as if set forth fully herein.

265.    This Count does not sound in fraud.

266.    As set forth above, Defendants violated the Florida Deceptive and Unfair Trade Practices Act, Florida Statutes § 501.21, *et seq.* ("FDUTPA"), when they engaged in unfair or deceptive acts or practices in the conduct of any trade or commerce, represented that goods or services have characteristics, ingredients, uses, benefits or quantities that they do not have, and engaged in any other fraudulent or deceptive conduct which created a likelihood of confusion and misunderstanding.

267.    FDUTPA was enacted to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce.

268.    For the reasons discussed herein, Defendants violated and continue to violate FDUTPA by engaging in the herein described unconscionable, deceptive, unfair acts or practices proscribed by Florida Statute § 501.201, *et seq*. Defendants' omissions and practices described herein were likely to, and did in fact, deceive and mislead members of the public, including consumers acting reasonably under the circumstances, to their detriment.

269.    Defendants' actions constitute unconscionable, deceptive, or unfair acts or practices. Defendants omitted material facts regarding hazardous conditions in and the habitability of homes it owned and/or operated at MacDill AFB, including the presence of dangerous mold, and engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers, in violation of FDUTPA.

270.    Defendants knowingly engaged in these false, misleading and deceptive practices to increase their profits.

271.    Defendants' acts in violation of the laws of Florida include, but are not limited to:

- representing that goods or services are of a particular standard, quality, or grade, if they are of another;

- representing that work or services have been performed on, or parts replaced in, good when the work or services were not performed or the parts not replaced; and

- failing to disclose information regarding goods or services which were known at the time of the transaction where such failure was intended to induce the consumer into the transaction which the consumer would not have entered had the information been disclosed.

272.     By virtue of their ownership and/or management of the houses at MacDill AFB, Defendants were uniquely aware of the age of the houses, the need to repairs, remodeling, and remediation, and the existence of mold and other hazardous conditions.

273.     Defendants' misrepresentations and omissions regarding the habitability and safety of the houses at MacDill AFB were materially false and misleading.

274.     Plaintiffs and the Class suffered damages as a direct result of Defendants' wrongful conduct when they leased the premises and continued to pay rent for and reside in the premises. Defendants' practices were likely to deceive, and did deceive, consumers acting reasonably under the circumstances.

275.     Plaintiffs and the Class would not have leased the premises nor continue to reside in the premises had they known the truth. Thus, they are entitled to refunds of all monies paid for rent of the premises, as well as other damages suffered, including statutory and other damages.

276.     Plaintiffs also seek, on behalf of themselves and the Class, an injunction to prohibit Defendants from continuing to engage in the deceptive and unfair trade practices complained of herein, and an order requiring Defendants to correct Defendants' misrepresentations and omissions.

## COUNT IV
## NEGLIGENCE/GROSS NEGLIGENCE
### (by all Plaintiffs against all Defendants)

277.     Plaintiffs repeat and reallege all preceding allegations as if set forth fully herein.

278.     As the owners and/or property managers of houses at MacDill AFB, Defendants owed a duty to Plaintiffs and the Class to keep the premises in a reasonably safe condition and to remediate moisture, mold, and other dangerous conditions pursuant to a reasonable standard of care required of owners and property managers of residential tenancies.

279.    Defendants knew or should have known that moisture and mold was present and growing within Plaintiffs' and Class members' homes. Defendants have received numerous complaints of moisture and mold growth in the homes at MacDill AFB but failed to remediate the problems or take adequate corrective action.

280.    In addition, by virtue of the leases and other records, Defendants are aware that their residents included infants, children, or the elderly, each of whom are especially susceptible to the effects of dangerous moisture and mold.

281.    Defendants knew or should have known that the MacDill AFB homes were either not constructed properly due to common water intrusion issues experienced by Plaintiffs and the Class, and/or that there were not adequate vapor and/or moisture barriers, and/or that the air conditioning units and plumbing installed within the homes are not designed or installed properly and result in frequent failures and leaks.

282.    Defendants breached the duties they owed to Plaintiffs and the Class by failing to repair defective equipment and failing to repair leaks and moisture within the homes, leading to the presence of moisture and the growth of mold, and resultant damages, to Plaintiffs' and Class members' health and property.

283.    Defendants' conduct was of a gross and flagrant character, evincing blatant and reckless disregard for the health and safety of residents at MacDill AFB, and to the safety of persons exposed to the hazardous effects of dangerous moisture and mold.

284.    Defendants' reckless indifference to the rights of others is the equivalent to an intentional violation of them.

285.    Plaintiffs and Class members were damaged by Defendants' negligent and grossly negligent conduct, and recklessness.

286.     Defendants' failure to properly inspect and repair the homes of Plaintiffs and Class members, failure to address moisture and other building issues, failure to properly repair leaks, and failure to use proper care when remediating moisture, mold and other dangerous conditions is the direct cause of Plaintiffs' and Class members' damages.

287.     Plaintiffs' and Class members' exposure to moisture and mold and other dangerous conditions is the direct, proximate, and foreseeable cause of their damages.

288.     Plaintiffs and the Class are entitled to recover damages in amount to be proven at trial.

## COUNT V
## UNJUST ENRICHMENT
### (by all Plaintiffs against all Defendants)

289.     Plaintiffs repeat and reallege all preceding allegations as if set forth fully herein.

290.     Plaintiffs and the Class conferred a benefit on Defendants in the form of monies paid for occupancy of the premises owned and/or operated by Defendants on MacDill AFB.

291.     Defendants failed to provide Plaintiffs and the Class with safe and habitable premises.

292.     In light of Defendants' wrongful conduct as described herein, Defendants' retention of the benefits provided by Plaintiffs and the Class would be inequitable and unjust.

293.     Plaintiffs and the Class are entitled to restitution of all monies paid to Defendants.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and other members of the Class, respectfully request that the Court:

A.     Certify the Class pursuant to Federal Rule of Civil Procedure 23 and designate Plaintiffs as the representatives of, and designate Berger Montague PC and The Whistleblower Law Firm as counsel for the Class;

B.       Enter judgments against each of the Defendants and in favor of the Plaintiffs and members of the Class;

C.       Award Plaintiffs and the Class actual, equitable, compensatory, and punitive damages (based on Defendants' intentional and reckless conduct) as allowed by law in an amount to be determined at trial;

D.       Award Plaintiffs and the Class declaratory and injunctive relief, as appropriate;

E.       Award Plaintiffs and the Class their costs of suit, as well as reasonable attorneys' fees, as allowed by law;

F.       Award Plaintiffs and the Class pre-judgment and post-judgment interest, as allowed by law; and

G.       Award all other relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class demand a trial by jury on all issues so triable.

Dated:  December 2, 2019

Respectfully submitted,

Natalie Khawam
**WHISTLEBLOWER LAW FIRM, PA**
400 N. Tampa Street, Suite 1015
Tampa, FL 33602
Telephone: (813) 944-7853
nataliek@813whistle.com

Shanon J. Carson
E. Michelle Drake
Glen Abramson
Lane L. Vines
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
scarson@bm.net
emdrake@bm.net
gabramson@bm.net
lvines@bm.net

*Attorneys for Plaintiffs and the Proposed Class*